**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 11-61341-CIV-ALTONAGA/Simonton**

**M. ANGELLA WILLIAMS**,

       Plaintiff,

vs.

**CROWN LIQUORS OF**
**BROWARD, INC.**,

       Defendant.

_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendant, Crown Liquors of Broward, Inc.'s ("Crown['s]") Motion for Summary Judgment ("Motion") [ECF No. 38], filed February 21, 2012. Plaintiff, M. Angella Williams ("Williams") filed a Complaint [ECF No. 1] against Crown on June 14, 2011, alleging pregnancy discrimination in violation of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e, *et seq.* ("PDA") (Count I); retaliation in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA") (Count II); and interference in violation of the FMLA (Count III). Crown now moves for summary judgment on all claims against it. The Court has carefully considered the Motion, the parties' submissions, the record, and the applicable law.

**I.      BACKGROUND**[1]

Crown is a family-owned business engaged in the retail sale of wine, spirits, cigars, specialty gourmet foods, and party favors. (*See* Def.'s Statement of Material Undisputed Facts ("SMF") ¶ 8 [ECF No. 39]). Crown operates 28 stores, mostly in south Florida, and employs 225 people. (*See*

---

[1] Unless otherwise noted, the facts are undisputed.

*id.*).  Its CEO is Paul ("Bubba") Kassal; Bubba's brother Michael Kassal is vice-president of personnel.  (*See id.*).  Their father is also an executive officer and started the company with their grandfather in 1955.  (*See id.*).

Crown hired Williams on October 13, 2003 as a human resources manager.  (*See id.* ¶ 9).  Six months later, Crown promoted Williams to be human resources director.  (*See id.*).  In that position, Williams's primary duties were to ensure Crown's employees were paid; file all reports with appropriate agencies; prepare internal employment policies; train managers in good hiring practices; run background checks; ensure compliance with safety, workers' compensation, and FMLA issues; terminate employees; counsel employees; file unemployment compensation reports; and participate in strategic planning for new stores.  (*See id.* ¶ 10).

Crown's main offices are in Ft. Lauderdale, to which Williams spent over one hour commuting each day from her home in Port St. Lucie.  (*See id.* ¶ 11).  Williams learned she was pregnant in March or April 2008, due to deliver in November 2008.  (*See id.* ¶ 12).  She decided to reveal her pregnancy to family, friends, and Crown in June of that year.  (*See id.*).  On the morning she decided to inform Crown of her pregnancy, the first person to come to her office was Bubba Kassal, who congratulated her and laughingly said he did not know she had a boyfriend.  (*See id.* ¶ 13).  He then spoke of his two boys and added that he was sorry her mother was no longer alive to support her at that time.  (*See id.*).  Bubba Kassal called his mother, who called Williams the next day to congratulate her.  (*See id.*).

Soon after, on June 13, 2008, Williams visited the office of her physician, who became concerned with her high blood pressure.  (*See id.* ¶ 14).  The physician asked if she could work from home, and Williams assured him she could.  (*See id.*).  The physician wrote a note to this effect.  (*See*

*id.*).  Driving back to the office, Williams called Crown's counsel, Amy Galloway ("Galloway"), with whom Williams had worked on human resource matters.  (*See id.* ¶ 15).  Williams informed Galloway about her pregnancy, the health risks, and the support she had received from "the Kassals." (*Id.*).  Galloway advised Williams to go in and say she needed to work at home, and Williams thus arranged a meeting with Bubba and Michael Kassal on June 18, 2008.  (*See id.*).

At the meeting, Williams gave the Kassals a copy of her physician's note, acknowledged she had been with Crown a long time, and thanked them for the work she had done.  (*See id.* ¶ 16).  She mentioned her pregnancy complications — including blacking out and falling — which made her driving commute dangerous.  (*See id.*).  She offered to recruit a temporary replacement, but wished to be kept on the payroll in return for performing various human resource duties as best she could, mostly from home.  (*See id.*; SMFO ¶ 16).  Crown accepted this request, and the Kassals generally agreed to pay Williams her "normal salary through delivery in return for working on human resources matters on a limited basis."  (SMF ¶ 17).

An important component of the June 18 agreement was that its term was through the birth of the baby.  (*See id.* ¶ 18).  Bubba Kassal asked what would happen if, after the birth, Williams decided not to return to work.  (*See id.*).  Williams replied that she needed to work and could bring her aunt from Jamaica to watch the baby.  (*See id.*).  Bubba Kassal asked when the work-at-home arrangement would go into effect, and Williams replied it was intended to begin right away, but she would try to work with them and help find someone to perform her duties in her absence.  (*See id.*).  When he asked what would happen if they liked the replacement, Williams replied that she understood they had a business to run.  (*See id.*).  Bubba Kassal promised to memorialize the June 18 understanding.  (*See id.*).

Despite the doctor's orders, Williams continued reporting to the office until the July 4th weekend, and at that time she asked Bubba Kassal about the written understanding. (*See id.* ¶ 19). He replied that Galloway was working on it, and on July 7 Galloway e-mailed Bubba Kassal a draft letter agreement, which was never sent to Williams, but set forth Crown's understanding that no promise of employment was made to Williams after her baby's birth. (*See id.* ¶ 19; SMFO ¶ 19). On July 8th, Williams sent an e-mail ("July 8 E-mail") to the Kassals and Galloway advising them that she was on bed rest and would submit FMLA paperwork as soon as possible. (*See* SMF ¶ 20; July 8 E-mail, Declaration of M. Angella Williams ("Williams Decl.") [ECF No. 45-1] Ex. 2 [ECF No. 45-3]). For some reason, the intended recipients did not receive this message, so were unaware in early July of Williams's status. (*See* SMF ¶ 20).

On July 11, Williams visited the doctor, who found that her blood pressure had soared to 200/100. (*See id.* ¶ 21). Williams talked the physician out of ordering an ambulance to take her to the hospital, but he ordered bed rest for her. (*See id.*). On the same day, Williams briefly returned to the office to advise her staff that she would be at home for the time being. (*See id.* ¶ 22). At the office, she saw an invoice from Galloway's law firm reflecting that legal research had been done a couple of days after the June 18 meeting regarding the Title VII ramifications of Williams's situation. (*See id.*; Tripp Scott Invoice, Williams Decl. Ex. 3 [ECF No. 45-3]). Williams assumed Crown was terminating her and began to cry. (*See* SMF ¶ 22). Later the same day, Williams returned to the doctor's office and had him complete the FMLA paperwork ("FMLA Form"). (*See id.* ¶ 23; FMLA Form, Williams Decl. Ex. 4 [ECF No. 45-3]). Also on July 11, Williams returned to the Crown office with the completed FMLA Form, leaving it for Bubba Kassal. (*See* SMF ¶ 24). Pursuant to this paperwork, the FMLA 12-week period expired before Williams's projected delivery

date.  (*See id.*).  However, Williams believed she was also eligible for additional time off pursuant to

Crown's internal FMLA policy, "Leave of Absence Without Pay" policy, and accrued-vacation

policy, as set forth in Crown's employee handbook which Williams helped draft.  (SMFO ¶ 24).

On July 14, Williams returned a call from Galloway, updating the latter on her condition.

(*See* SMF ¶ 25).  As Galloway confirmed in a July 14 e-mail ("July 14 E-mail") to Bubba Kassal,

Williams wished to take her FMLA time.  (*See id.*).  Galloway promised Williams to discuss with

Bubba Kassal a reworking of Williams's benefits, including maintaining present health benefits and

obtaining disability benefits.  (*See id.*).  On August 5, Williams e-mailed the Kassals advising that

she had not received her August 2 paycheck, and that she "continued" to be available to perform her

end of the June 18 understanding.  (*See id.* ¶ 26; August 5 E-mail Exchange, Williams Decl. Ex. 8

[ECF No. 45-3]).  Ten minutes after receiving the e-mail, Bubba Kassal e-mailed Galloway stating

that Crown would pay Williams disability benefits through the baby's birth, pay the company's

portion of health insurance until the birth, and give Williams access to her company laptop and cell

phone until October in return for a "release."  (*Id.*).

In an August 5 letter from a human relations employee to Galloway, Crown's position was

internally documented.  (*See id.* ¶ 27).  The letter states that Williams's FMLA start date was July 11,

2008, and the end date was October 4, 2008.  (*See id.*).  The letter further restates the undertakings

Bubba Kassal described in his August 5 e-mail and notes that Williams had exhausted her sick and

vacation time.  (*See id.*).  The letter further states that the June 18 understanding was superseded by

Williams's subsequent incapacitation.  (*See id.*).

On August 14, Galloway sent a letter ("August 14 Letter") to Williams reiterating much of

Bubba Kassal's August 5 e-mail and noting that, due to Williams's health issues, Crown had hired an

acting human resources director on July 28.  (*See id.* ¶ 28; August 14 Letter, Williams Decl. Ex. 9 [ECF No. 45-3]).  The August 14 Letter refers to Williams's "severance," which Williams took to mean she had been terminated.  (SMFO ¶ 28).  A couple of weeks later, Williams e-mailed a brief message to Galloway acknowledging receipt of the letter and thanking her for all she "does."  (SMF ¶ 28).  Williams also left numerous messages and finally spoke with Galloway on August 26, 2008, telling Galloway she wished to take an additional 30 days of unpaid leave pursuant to Crown's policy, and that with the additional three weeks of vacation she would accrue at her five-year anniversary on October 13, 2008, she would have enough leave to take her well past her due date. (*See* SMFO ¶ 28 (citing Williams Decl. ¶ 22)).  Galloway responded that Williams had "no idea" how her life would change after the delivery, and that she would want to find a job closer to home, "maybe in West Palm Beach."  (*Id.* (quoting Williams Decl. ¶ 22)).  Galloway affirmed that Williams was terminated, and that someday Williams would "thank her" for doing this.  (*Id.* (quoting Williams Decl. ¶ 22)).

On October 8, Galloway sent another letter ("October 8 Letter") to Williams stating that the FMLA period had expired and that Crown continued to perform the conditions detailed in the August 14 Letter; Galloway also asked Williams to return her laptop and cell phone.  (*See id.* ¶ 29; October 8 Letter, Williams Decl. Ex. 20 [ECF No. 45-3]).

On November 5, Williams delivered her baby.  (*See* SMF ¶ 30).  One month later, she spoke with Galloway and asked about returning to work; Galloway told her Crown considered it a voluntary separation as of October 4, 2008.  (*See id.*).  Crown agreed to pay Williams another week's salary, through July 18, and extended her insurance through December 31 so Williams would have another chance to exercise her COBRA right.  (*See id.*).

Williams had previously worked from home for a four to six-week period while converting payroll systems on the computer.  (*See id.* ¶ 32).  Crown has also allowed other managers to work at home.  (*See id.* ¶ 35).  One such manager's wife was recovering from a broken leg, and another manager was recovering from a heart attack and stroke.  (*See id.*).

On May 26, 2009, Williams filed a charge with the Florida Commission on Human Relations ("FCHR") that her former employer Crown discriminated against her on the basis of her pregnancy.  (*See id.* ¶ 1).  Williams's claims were adjudicated at an April 16, 2010 administrative hearing, at which Williams was represented by counsel.  (*See id.* ¶ 3).  She was permitted to call and cross-examine certain witnesses, introduce evidence, and conduct limited discovery before the hearing.  (*See id.* ¶ 4; Pl.'s Concise Statement of Material Facts . . . ("SMFO") ¶ 4 [ECF No. 44]).  After the hearing, Administrative Law Judge Robert Meale issued an order ("Recommended Order") making findings of fact.  (*See* SMF ¶ 5; Recommended Order, Def.'s Ans. and Aff. Defenses Ex. B [ECF No. 4]).  Williams did not submit written exceptions to the Recommended Order.  (*See* SMF ¶ 6).  The FCHR entered a final order ("FCHR Order") dismissing her claims on September 7, 2010.  (*See id.* ¶ 2; FCHR Order, Williams Decl. Ex.11 [ECF No. 45-3]).

Williams then sent a request ("Request for Review") to the Equal Employment Opportunity Commission ("EEOC") to conduct a "substantial weight review," as provided for in the FCHR Order.  (SMFO ¶ 2; Request for Review, Williams Decl. Ex. 12 [ECF No. 45-3]).  The EEOC conducted its review and issued a letter of determination ("EEOC Letter") stating that "the evidence obtained does establish a violation under Title VII [of the Civil Rights Act of 1964] . . . [s]pecifically, that Charging Party was discriminated against when she was terminated due to a condition of pregnancy related to her sex/female."  (SMFO ¶ 3 (quoting EEOC Letter, Williams

Decl. Ex. 13 [ECF No. 45-3])).

## II.   LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In making its assessment of summary judgment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### III.    ANALYSIS

Crown argues that it is entitled to summary judgment in its favor on each of Williams's three claims. The Court addresses Crown's arguments in turn.

### a.    Count I — Discrimination Under the Pregnancy Discrimination Act

Crown contends that Williams cannot make out a *prima facie* case of discrimination under the PDA. (*See* Mot. 2). The PDA provides that the prohibition in Title VII of the Civil Rights Act of 1964 against employment discrimination on the basis of "sex" includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). "There are two types of discrimination actionable under Title VII, disparate treatment and disparate impact." *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999). To demonstrate the former, the plaintiff must provide "proof of discriminatory intent." *Id.* This may be done through circumstantial evidence permitting an inference of intentional discrimination, as well as direct evidence. *See id.*

To prove discrimination using circumstantial evidence, the plaintiff must proceed under the evidentiary framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell* dealt with the "proper order and nature of proof in actions under Title

VII," *id.* at 794, and established a three-part burden-shifting framework in which the first step of the inquiry is to determine whether a plaintiff has set out a *prima facie* case of discrimination, *see id.* at 802.  Once the plaintiff has done so, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the complained-of act, *id*. at 802, after which the burden shifts back to plaintiff to show that the stated reason is "in fact pretext," *id*. at 804.

The elements a plaintiff must show to establish the *prima facie* case of pregnancy discrimination are that:

> (1) she was pregnant (a member of a protected class) and her employer knew that she was pregnant; (2) she was performing her duties satisfactorily; (3) she was discharged; and (4) similarly situated employees not in the protected class were treated more favorably.

*Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (11th Cir. 2001) (citation omitted).  The fourth factor is met when the plaintiff "suffered from a differential application of work or disciplinary rules." *Spivey*, 196 F.3d at 1312.

### 1.    *Findings of Administrative Law Judge Meale and the FCHR*

According to Crown, Williams's claims were the subject of the FCHR Order of September 7, 2010, which fully adopted the Administrative Law Judge's Recommended Order, to which Williams never filed written exceptions.  (*See* Mot. 4–5).  Crown further contends that in written interrogatories, it asked Williams to identify any disputes with the Administrative Law Judge's findings of fact, and Williams only identified one such disputed fact — whether she was "terminated by mutual agreement."  (*Id.* 5 (quoting Recommended Order) (internal quotation marks omitted)).  Crown concludes that, based on the Recommended Order and FCHR Order, "[t]he undisputed facts of this case clearly establish that CROWN acted properly and did not discriminate against WILLIAMS due to her pregnancy."  (*Id.* 6).  Crown reasons that as a result, Williams cannot

establish a *prima facie* case of discrimination because she cannot demonstrate two of the four elements — that she was subject to an adverse employment action (discharge), and that similarly-situated non-pregnant employees were treated more favorably. (*See* Mot. 6).

According to Williams, the EEOC's review of the FCHR Order resulted in a finding that the evidence supported Williams's claim of pregnancy discrimination. (*See* Resp. 2 [ECF No. 43]). Williams points out that the FCHR Order itself sets forth her right to review by the EEOC. (*See id.* 4 (quoting FCHR Order ("[Y]ou have the right to request EEOC to review this Commission's final agency action.")); 29 C.F.R. § 1601.76 ("The Commission shall notify the parties whose cases are to be processed by the designated, certified FEP agency of their right, if aggrieved by the agency's final action, to request review by the Commission within 15 days of that action.")). Williams accordingly requested a review by the EEOC in writing, explaining, "I believe that all the facts were not taken into consideration, and that there were significant evidences that were not considered by the Administrative Law Judge." (Request for Review). It is undisputed that the EEOC found the evidence established a Title VII violation, explaining Williams "was discriminated against when she was terminated due to a condition of pregnancy related to her sex/female." (EEOC Letter).

Nevertheless, Crown argues that the EEOC did not conduct a substantial weight review in according Judge Meale's findings the proper weight. (*See* Reply 3 [ECF No. 46]). Crown bases this argument on the fact that the EEOC Letter does not state that a substantial weight review was conducted or identify any specific factual or legal finding of Judge Meale that the EEOC took issue with. (*See id.* 4). According to Crown, the EEOC could not have conducted a substantial weight review, as no transcript of the hearing before Judge Meale was ordered until well after the instant action commenced. (*See id.*). Finally, a review of the EEOC's Investigative Log (Reply Ex. A [ECF

No. 46-1]) shows that the EEOC retrieved the file and processed a "Cause Determination." (*Id.*).

Crown cites no law in support of its position that based on the above factors, the EEOC could not

have properly reviewed the FCHR Order and Judge Meale's findings.

The EEOC Letter states that the EEOC "reviewed and examined the investigation and

[FCHR] Order" and drew conclusions based on the evidence. (EEOC Letter). As for the transcript,

the Court notes that the FCHR itself did not have access to it. The FCHR Order states:

> A transcript of the proceeding before the Administrative Law Judge
> was not filed with the Commission. In the absence of a transcript of
> the proceeding before the Administrative Law Judge, the
> Recommended Order is the only evidence for the Commission to
> consider.

(FCHR Order 1–2 (collecting cases)). Ultimately, the Court sees no reason based in fact or law to

conclude that the EEOC failed to conduct a substantial weight review pursuant to its mandate.

Apparently Crown deems the fact that the EEOC reached a different result from Judge Meale as

evidence in itself that the EEOC did not employ the correct standard of review. Such a view would

vitiate the EEOC's reviewing role and is not supported by law.

Williams cites *Rodriguez v. Wet Ink, LLC*, 603 F.3d 810 (10th Cir. 2010), for the proposition

that the findings of Judge Meale and a body like the FCHR do not bind the EEOC and the Court in

any case. Addressing this point, and somewhat in tension with its argument that the EEOC's review

was improper, Crown "concedes that, in and of themselves, Judge Meale's findings are not binding

on this Court." (Reply 1). Yet, Crown continues insisting that "this Court can and should rely on

Judge Meale's findings in deciding summary judgment because WILLIAMS cannot point to any

record evidence which disputes those findings." (*Id.*). Crown dismisses Williams's declaration by

asserting that it "merely restates the actions WILLIAMS took, and it does not substantively

contradict the findings made by Judge Meale." (*Id.* at 2).  Crown does not otherwise controvert the substance of the declaration.

Thus, the parties dispute whether the record establishes a *prima facie* case for pregnancy discrimination, particularly with respect to the two factors Crown identifies — the existence of an adverse employment action, and the more-favorable treatment of similarly-situated non-pregnant employees.  (*See* Mot. 6).  Williams contends that the burden to establish a *prima facie* case of discrimination is "not onerous," requiring only that the plaintiff establish facts adequate to permit a presumption of discrimination.  (Resp. 7 (quoting *Walden v. Ctrs. for Disease Control and Prevention*, 669 F.3d 1277 (11th Cir. 2012))).  She addresses the two elements Crown claims she has failed to establish.

### 2.   *Adverse Employment Action*

First, Williams asserts the undisputed facts show she was subject to an adverse employment action.  The Eleventh Circuit has held:

> to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).  While it may be Crown's position that Williams's separation was voluntary, there is ample evidence in the record to the contrary, sufficient to create an issue of material fact at the very least.

The parties appeared to work out a mutual understanding at a meeting on June 18, 2008, after Williams's physician expressed concern over her health and high blood pressure.  (*See* SMF ¶ 16).

At the June 18 meeting, Williams described her pregnancy complications and offered to recruit a temporary replacement while she worked from home, although she asked to be kept on the payroll in exchange for working as best she could from home. (*See id.*; SMFO ¶ 16). Crown accepted this, and the Kassals agreed to pay Williams her "normal salary through delivery in return for working on human resources matters on a limited basis." (SMF ¶ 17). Thus, the June 18 understanding was that Williams would remain employed with Crown at least through her delivery, and Williams considered any replacement of her position in the office during this time to be temporary. The Court does not find evidence in the record that Williams agreed on June 18 *not* to return to work after her pregnancy. And the draft agreement Galloway sent to Bubba Kassal on July 7, 2008, stating that no promise of post-delivery employment was made to Williams, was never sent to her. (*See* SMF ¶ 19; SMFO ¶ 19).

Whether or not the June 18 understanding subsequently changed is in dispute. The understanding was never memorialized in writing, as Williams never signed off on Crown's internal draft. Moreover, a couple of days after the June 18 meeting, Galloway researched the ramifications under Title VII of Williams's employment situation, which Williams discovered on July 11; she assumed she was being terminated and began to cry. (*See* SMF ¶ 22). An August 5 letter internally documenting Crown's position states the June 18 understanding was superseded by subsequent developments with Williams's health. (*See id.* ¶ 27). This letter was never sent to Williams. In any event, an e-mail by Williams to the Kassals on the same date stated she "continued" to be able to perform under the June 18 understanding. (*Id.* ¶ 26).

On August 14, Galloway sent a letter to Williams. (*See id.* ¶ 28). The initial portion of the letter confirms the content of the June 18 meeting. (*See* Aug. 14 Letter 1). The letter also states that

on July 14, Galloway and Williams spoke, and Williams said she would not be able to carry out her duties due to health concerns but would be available for any questions. (*See id.* 2). The letter also confirms that during that conversation Williams advised she would go on FMLA leave. (*See id.*). The letter states that Crown hired an acting Human Resources Director in Williams's absence, and that Crown was "willing to provide . . . [a] compensation and benefits *severance* package," providing certain benefits through the term of her pregnancy. (*Id.*) (emphasis added).

In a phone call on August 26, 2008, Galloway confirmed that Williams was terminated, and that someday Williams would "thank her." (SMFO ¶ 28). A month after Williams delivered her baby in November, she asked Galloway about returning to work, and Galloway told Williams Crown considered it a voluntary separation as of October 4. (*See id.* ¶ 30).

The record establishes, at the very least, an issue of material fact as to whether Williams's separation was voluntary or an adverse employment action-*cum*-termination. The Court sees no facts in the record suggesting Williams clearly expressed to Crown a desire to end her employment. While certain facts suggest Crown's understanding was that the June 18 agreement was superseded by subsequent events, Williams never acquiesced in this understanding. Rather, there is ample evidence that Williams wished to remain employed at Crown and expressed her wish to take FMLA and other leave through her delivery date. That the termination was involuntary is also suggested by the reference to a severance package, and the fact that Galloway told Williams she would someday thank her for the termination, implying that Williams was hardly grateful at the time. (*See id.* ¶ 28).

Williams has shown issues of material fact exist as to whether her separation from Crown constituted an adverse employment action.

3.      *Treatment of Similarly-Situated Employees*

With regard to the second disputed discrimination factor, Williams asserts that similarly-situated non-pregnant employees were treated more favorably than she was.  (*See* Resp. 9).  She contends she makes this showing by demonstrating that she was replaced by an individual not a member of her protected class, and that Crown treated a similarly-situated non-pregnant employee more favorably.  (*See id.* (citing *Miranda v. BBII Acquisition Corp.*, 120 F. Supp. 2d 157 (D.P.R. 2000))).

The Eleventh Circuit has held that a pregnant employee suffered from a differential application of work rules and was subjected to a violation of the PDA when the employer denied her a benefit generally available to temporarily-disabled workers in similar job positions.  *See Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1383–34 (11th Cir. 1994).  In *Byrd*, the employee's pregnancy-induced absences were within the limits of the employer's sick leave policy and were also the substantial motivating factor behind her termination.  *See id.* at 1380.  The question on appeal was whether the employee "was required to demonstrate that non-pregnant workers with similar records of medically-based absences were treated more favorably than she was."  *Id.*  The Eleventh Circuit reversed the district court's finding that this showing was necessary.  *See id.*

The court in *Byrd* held that the PDA required that covered employees "*be provided the same benefits as those provided other disabled workers.*"  *Id.* at 1382 (emphasis in original).  The court found that the plaintiff had made her *prima facie* showing of discrimination by proving that a substantial cause of her discharge was her use of the sick-leave policy for pregnancy-related conditions because she had shown "that the policy *in practice* ha[d] been applied unequally to pregnancy-related conditions."  *Id.* at 1383 (emphasis in original) (citing *Garner v. Wal-Mart Stores,*

*Inc.*, 807 F.2d 1536, 1538 (11th Cir. 1987) (holding that where pregnant employee was treated contrary to employment manual, inference of pregnancy discrimination arose)).  The court held that providing evidence of other specific employees treated better than plaintiff was unnecessary because "the only logical inference to be drawn in this case is that the [employer's] policy customarily was followed."  *Id.*  Otherwise, the burden would have been on the employer to prove the "unusual scenario" that employees were commonly discharged for taking their allotted sick time.  *Id.*

It appears to the Court that the parties can hardly dispute whether Williams's discharge was motivated by her pregnancy-related conditions.  Crown itself states the following:

> . . . WILLIAMS' claim of discriminatory treatment regarding working at home misses the larger point that, in the June 18 understanding, CROWN allowed her to work at home for the duration of her pregnancy.  *This understanding was defeated*, not by CROWN'S insistence that she work in the office, but *by WILLIAMS' deteriorating medical condition*.

(SMF ¶ 34) (emphasis added).  No one disputes that this deteriorating medical condition was due to Williams's pregnancy.  This purported change in the understanding, from Crown's point of view, is what led to Williams's termination.  (*See id.* ¶ 35; Aug. 14 Letter).  In fact, Judge Meale's findings, which Crown endorses wholesale, could not be clearer in stating that the termination "was due to complications associated with her pregnancy."  (Recommended Order 4–5).

At the very least, there is an issue of fact as to whether Crown's leave policies were applied unequally to Williams.  Admittedly Crown processed FMLA leave for Williams with an end date of October 4, 2008, or several weeks before her due date.  (*See* SMF ¶ 27).  But the parties dispute whether Williams was otherwise entitled to other leave under Crown's policies.  The August 5 Crown internal letter between a human relations employee and Galloway states that Williams had exhausted all of her sick and vacation time.  (*See id.*).  However, in the August 26 phone

conversation between Williams and Galloway, Williams expressed her belief that she was entitled to 30 days of additional unpaid leave under Crown's policy, and an additional three weeks of vacation accruing on October 13, 2008.  (*See* SMFO ¶ 28 (citing Williams Decl. ¶ 22)).  This would have given Williams sufficient time, through her delivery date, to take leave under Crown's policy while remaining an employee.  (*See id.*).

Williams further attaches copies of Crown's FMLA policy (FMLA Policy, Williams Decl. Ex. 5 [ECF No. 45-3]; leave of absence without pay policy (Leave Policy, Williams Decl. Ex. 6 [ECF No. 45-3]); and vacation policy (Vacation Policy, Williams Decl. Ex. 7 [ECF No. 45-3]).  Crown has not contested the validity of these exhibits in any way.  The policy on leave of absence without pay indicates that an employee must apply for leave, which is not an automatic entitlement.  However, the facts show that in August, or several weeks before Williams's FMLA leave expired, Crown referred to her "severance" in written correspondence to her and confirmed her termination.  (SMFO ¶ 28).  Thus, there appears to be an issue of fact as to whether Crown denied Williams vacation and leave benefits, or an opportunity to request her benefits, to which she was entitled under Crown's policies.  This is particularly true with respect to Williams's vacation benefits, which appear to accrue automatically.  (*See* Vacation Policy 5.12.I.).  This failure to apply Crown's own policies to Williams would create the inference of discrimination required to establish a *prima facie* case.  *See Byrd*, 30 F.3d at 1383; *Garner*, 807 F.2d at 1538.

Moreover, although the holding in *Byrd* makes clear Williams need not necessarily point to specific similarly-situated, non-pregnant individuals treated differently than her, she has done so nevertheless.  She mentions other managers who were allowed to work from home due to non-pregnancy-related medical conditions.  (*See* SMFO ¶ 35).  The parties dispute how similarly-situated

these people were to Williams; Crown claims these managers all worked in some reduced fashion, and their duties were "district-wide," not "corporate-wide." (SMF ¶ 35). In any event, issues of fact as to whether Williams was treated less favorably than other non-pregnant similarly-situated employees prevent the grant of summary judgment in favor of Crown on this claim.

### b. Count II — Retaliation Under the Family Medical Leave Act

Crown further argues that Williams cannot make out a *prima facie* case of discrimination under the FMLA. (*See* Mot. 6). The FMLA grants, to eligible employees, the right to "12 workweeks of leave during any 12-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter; . . . [or] [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(A) & (D). The employee is moreover granted the right "to be restored by the employer to the position of employment held by the employee when the leave commenced; or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A) & (B).

The FMLA provides for two types of claims to enforce an employee's rights — "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act," *Strickland v. Water Works and Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citing 29 U.S.C. § 2615(a)(1)), and "retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." *Id.* (citing 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c)).

"[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having

exercised an FMLA right." *Id.* at 1207 (citing *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)).  The plaintiff has the "increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* (quoting *King*, 166 F.3d at 891).

Crown contends, in conclusory fashion, that since "the undisputed facts of this case clearly establish that CROWN acted properly and did not discriminate against WILLIAMS due to her pregnancy," Williams cannot establish a *prima facie* case of discrimination related to her engaging in a FMLA-protected activity.  (Mot. 7).  Crown cites *Earl v. Mervyns, Inc.*, 207 F.3d 1361 (11th Cir. 2000), and *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274 (11th Cir. 1999), in support. It is Williams's position that to the extent Crown relies on the FCHR Order for this argument, the FCHR never adjudicated Williams's retaliation and interference claims under the FMLA, nor made findings relevant to these claims.  (*See* Resp. 3).

Williams further states that, contrary to Crown's assertion, she establishes a *prima facie* case of FMLA retaliation because she was subjected to an adverse employment action.  (*See id.* 10). Williams distinguishes *Graham* by arguing that she was in fact terminated, unlike the plaintiff in that case who was merely threatened with termination.  (*See id.* 12).  To the extent the Court finds an issue of fact as to the existence of an adverse employment action under Williams's Title VII and PDA claim, this is also true for her FMLA claim.  *See Graham*, 193 F.3d at 1283 (applying precedent from Eleventh Circuit and other circuit courts under Title VII to analyze adverse employment action with respect to FMLA claim).

The Court further finds *Earl* inapposite, as in that case the court found the plaintiff did not present sufficient evidence to establish an issue of fact as to whether she was terminated because of

her FMLA request.  *See* 207 F.3d at 1367–68.  In that case, the record showed the plaintiff had been

fired for numerous punctuality infractions under the company's policy, *see id.* at 1368, which is not

the case here.

Williams has presented sufficient evidence to create an issue of fact as to whether her

termination was due to her FMLA request.  In her August 5 e-mail to the Kassals, Williams

referenced the June 18 understanding, and then wrote:

> I asked Amy about the memo you asked her to draft, and she
> responded that the said memo was sent to you last week.  As of
> August 5, 2008, I have not heard from you or Amy Galloway
> regarding your promises, expectations &/or FMLA request.  It has
> come to my attention that my position has been replaced as of July
> 28, 2008.  I believe this is a violation of FMLA policy.

(Aug. 5 E-mail Exchange).  The August 14 Letter from Galloway to Williams then confirms Crown's

understanding that Williams had requested FMLA leave on July 14, but asserts that Crown "thought

[she] had misspoken."  (Aug. 14 Letter 2).  The letter further states that Williams's replacement's

start date was July 28, 2008.  (*See id.*).  Moreover, Galloway wrote, "[g]iven the circumstances and

Crown's absolute requirement to have Human Resources support on site, Crown cannot agree with

your suggestion that Crown's actions constitute a violation of FMLA policy."  (*Id.*).  The August 14

Letter goes on to state:

> Based on the submitted [FMLA] request and the fact that no one at
> Crown heard back from you since you and I spoke on July 14, Crown
> is proceeding on the understanding you decided to take unpaid FMLA
> leave . . .  Despite the start date on the FMLA, Crown maintained you
> on full payroll through July18.  Based on your letter, I would like
> clarification as to your expectation as to the FMLA request once the
> FMLA leave package expires.  Independent of your FMLA election,
> Crown is willing to provide [a] compensation and benefits severance
> package."

(*Id.*).

The timing of the FMLA request, in conjunction with internal decisions at Crown to terminate Williams, reasonably suggests a causal relationship between these events. This is particularly true since the parties contemporaneously discussed the possibility that Williams's effective termination and replacement had been in violation of FMLA policy, and presumably related to her FMLA request. The Court moreover finds it significant that the termination was largely motivated by Williams's absences, which a reasonable fact-finder could connect with her leave request under the FMLA. The Court therefore finds an issue of fact as to whether the termination was a result of Williams's having exercised her right under the FMLA.

### c.  Count III — Interference Under the Family Medical Leave Act

Finally, Crown asserts that Williams cannot establish a case for interference under the FMLA. (*See* Mot. 8). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206–07; 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.").

According to Crown, it asked Williams in written interrogatories to list all actions she asserts Crown made in violation of the FMLA, to which Williams responded by identifying only one specific violation — that Crown did not timely notify Williams of her right to take FMLA leave, in violation of 29 C.F.R. § 825.300(b)(1). (*See* Mot. 8). Crown does not deny that it failed to timely notify Williams, but contends that this notification requirement is not a substantive FMLA right per the holding in *Strickland*, and that Crown may be exempt from the requirement due to "extenuating circumstances." (*Id.* 9 (quoting 29 C.F.R. § 825.300(b)(1))).

22

Williams asserts that the facts establish a *prima facie* case of FMLA interference — that she was entitled to a benefit to which she was denied.  (*See* Resp. 13).  The Court agrees with Williams.  As discussed, the record contains numerous facts suggesting Crown violated the FMLA with respect to Williams's employment, and the Court finds an issue of fact as to Williams's entitlement to a benefit denied.

The regulations provide:

> The Act's prohibition against "interference" prohibits an employer from *discriminating or retaliating against an employee* or prospective employee for having exercised or attempted to exercise FMLA rights.  For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave.  By the same token, *employers cannot use the taking of FMLA leave as a negative factor in employment actions*, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c) (emphasis added).  Thus, the same factual issues addressed with regard to Williams's retaliation claim also prevent summary judgment on the claim of FMLA interference.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion **[ECF No. 38]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, on this 28th day of March, 2012.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

23